UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EXODUS REFUGEE IMMIGRATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TODD ROKITA, in his official capacity as Attorney General of the State of Indiana,<br><br>Defendant. | ) | No. 1:25-cv-1885 |

**Complaint for Declaratory and Injunctive Relief**

**Introduction**

1. Exodus Refugee Immigration, Inc. ("Exodus") is a not-for-profit Indiana corporation with offices in Bloomington and Indianapolis that is dedicated to the protection of human rights and advances this mission by serving the resettlement needs of refugees and other displaced immigrants. It does this through the provision of legal services; mental health services; case management services; assistance with obtaining housing, food, clothing, and other household items; connection to social services benefits, banking, and employment; and the provision of English language and cultural orientation classes. It is a strong advocate for its immigrant and refugee clients and the immigrant community in general.

2. Recently, Attorney General Todd Rokita has served a Civil Investigative Demand ("CID") on Exodus, demanding responses to 39 interrogatories and 28 separate requests for production of documents seeking, among other things, an overwhelming amount of information as to Exodus's work with is clients for the last three years, communications concerning U.S. Immigration and Customs Enforcement (ICE), and Exodus's work with persons who are present in the United States without lawful status. The CID is part of a continuing pattern by the Attorney General of sending unreasonable and unlawful requests to immigrant service organizations and other entities across Indiana. These appear to be designed to advance a personal political agenda and to punish and deter organizations that assist, advocate for, and associate with immigrants and refugees. The investigation is without cause and is in bad faith.

3. The CID directed to Exodus is unjustified retaliation against the organization for engaging in expressive communications, advocacy, and association protected by the First Amendment. The investigation and the actions of the Attorney General in publicizing the investigation and similar investigations would likely deter a person of ordinary firmness from exercise of their First Amendment rights. It is therefore unlawful and this Court should so declare and should enter injunctive relief prohibiting defendant Rokita from enforcing the CID or engaging in similar retaliatory conduct.

**Jurisdiction, venue, and cause of action**

4. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

6. Declaratory relief is authorized by Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201, 2202.

7. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

**Parties**

8. Exodus is an Indiana domestic nonprofit corporation created in 1993 as Exodus Refugee/Immigration, Inc., although it has long gone by the name Exodus Refugee Immigration, Inc.

9. Todd Rokita is the duly elected Attorney General of the State of Indiana. He is sued in his official capacity.

**Legal Background as to CIDs**

10. Indiana law authorizes the Attorney General to issue a Civil Investigative Demand if "the attorney general has reasonable cause to believe that a person may be in possession, custody, or control of documentary material, or may have knowledge of a fact that is relevant to an investigation conducted to determine if a person is or has been engaged in a violation" of various Indiana statutes. Ind. Code § 4-6-3-3(a).

11. If the Attorney General has this reasonable cause they may issue a demand that requires the person to produce documents, answer interrogatories, or appear and testify under oath. *Id.*

12. The demand may not "contain a requirement that would be unreasonable if contained in a subpoena or subpoena duce tecum issued by a court in a grand jury investigation." Ind. Code § 4-6-3-5(1).

13. The person or entity served with the CID must respond within the time set by the Attorney General, which must generally be no less than ten days from service of the demand. Ind. Code § 4-6-3-4(2).

14. If the person does not respond within the time mandated by the Attorney General, the attorney general may file an action in an Indiana trial court to enforce the CID. Ind. Code § 4-6-3-4(2).

**Facts**

***Exodus***

15. Exodus serves the refugee and immigrant community from its primary office in Indianapolis as well as an office in Bloomington.

16. According to the United Nations High Commissioner for Refugees, a refugee is a person who, owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership in a particular social group, or political opinion, is outside the country of his nationality, and is unable to or, owing to such fear, is unwilling to avail himself of the protection of that country.

17. Immigrants include not only refugees, but also other persons who are not citizens of the United States.

18. Immigrants may or may not have legal status or otherwise be lawfully present in the United States.

19. Exodus provides a range of services to immigrants and refugees in the Indianapolis and Bloomington areas.

20. One of the ways in which persons become clients of Exodus is through an open intake process two days a week, where persons may walk in and talk to staff about their needs and Exodus will determine if, and how, they can be helped.

21. Once a client relationship is established, Exodus staff continue working with clients to serve their many needs.

22. Exodus serves refugees and immigrants with various types of immigration statuses and an immigrant does not have to have a particular immigration status to seek and receive services from Exodus.

23. Among other things, Exodus employs six lawyers and a number of paraprofessionals who assist Exodus's clients with adjusting their immigration status, work authorization, asylum, citizenship, family reunification, asylum issues, and other legal matters relating to their immigration status.

24. Exodus's legal staff also engage in "know your rights" and other legal oriented discussions and seminars with Exodus's clients where they discuss the rights that non-citizens have, including but not limited to, how to respond to ICE and ICE warrants.

25. Additionally, as part of its essential purpose as an advocacy organization designed to protect human rights and the needs of refugees and other immigrants, Exodus provides case management services; housing, food, clothing, and other household items; connection to social services benefits, banking, and employment; and English language and cultural orientation classes.

26. In the course of Exodus's work with its clients it will frequently communicate with office of the federal government concerning their clients and these communications will often include private and confidential documents revealing not only the identities of the clients, but their immigration status.

27. Exodus also has trained staff that can provide individual, couples, family, and group mental health treatment, as necessary. Records are kept of these therapeutic interactions.

28. In the course of its works with its clients, Exodus will have them sign releases of information authorizing disclosure of client information to various designated entities and agencies. The Attorney General of the State of Indiana is not one of the designated agencies or entities and the clients have provided this information with the understanding that it would not be shared outside of the terms of the release and sharing the information would violate the terms of the release.

29. Exodus has also cultivated relationships with landlords who are willing to house non-citizens who are in Indiana with lawful status. Exodus communicates with and works with these landlords to house some of its clients.

30. Exodus has also cultivated relationships with employers who are willing to employ its clients who have work authorization. It is frequently difficult for such clients, who are not citizens, to find employment due to their lack of proficiency in the English language and due to a lack of work experience in the United States. Exodus communicates with and works with these employers to find jobs for some of its clients.

31. Exodus is a strong advocate for the immigrant and refugee community and is a participant with other similar agencies and organizations that together advocate to policy makers concerning immigrant and refugee issues.

32. Exodus communicates regularly with these community partners to discuss strategy, cooperation, and ways to better serve its clients.

33. Exodus has participated in organized protests concerning immigrant and refugee matters and has communicated with other participants concerning these protests.

34. Exodus staff frequently speak to houses of worship and community groups concerning immigrant and refugee issues and Exodus's function.

35. Exodus is an agency that has been approved to assist in the resettlement of federally approved refugees under the Refugee Act of 1980 and has received federal

funding that is passed through Church World Services and the Indiana Family and Social Services Administration.

36. Exodus engages in extensive advocacy for the immigrant and refugee community.

37. Exodus has been in operation for many decades and has continued to associate with and advocate for its refugee and immigrant clients as this is its core purpose.

38. Exodus complies with all state and federal laws.

***CIDs issued by Attorney General Rokita to refugee and immigrant organizations***

39. In November of 2024, shortly before the presidential election, the Attorney General issued CIDs to the God is Good Foundation, an Evansville organization that assisted with refugee resettlement, and to the Tent Partnership for Refugees, an organization that seeks to integrate refugees into the labor market. At the same time, CIDs were sent to the Cass County Health Department, Logansport Community School Corporation, the Berry Global Group, and the Jackson County Industrial Development Corporation.

40. In a press release, Attorney General Rokita announced that the CIDs were motivated by "concerns about the largescale influx of illegal aliens and 'legal migrants'" into certain cities and towns in Indiana and further stated that:

> "Illegal immigration caused by 'border czar' Kamala Harris' perversion and misapplication of federal law has made every state a border state and imposed unsustainable costs on Logansport and other cities across the nation," Attorney General Rokita said. "It has also created serious sex and labor trafficking risks in all communities. I'm creatively trying to use every tool in the law to stop the Left's intentional destruction of Indiana."

> Attorney General Rokita is investigating coordinated efforts among international and local nonprofit "refugee resettlement" organizations and employers to bring large numbers of migrants to Indiana communities.

(Exhibit 1).

41. The God is Good Foundation, which was a small nonprofit assisting with refugee resettlement, ceased its resettlement efforts after receiving the CID.

42. In November, Attorney General Rokita also issued a CID to the Evansville-based Haitian Center, a United Way agency providing services to Evansville's Haitian community. The CID claimed that the Office of the Attorney General was investigating human trafficking and sought information concerning the assistance that the Haitian Center rendered to its clients. *See Rokita v. Berry Global Group, Inc.*, No. 82D07-2504-MI-002439 (Vanderburgh Superior Court), The Haitian Center's Response in Opposition to Enforce Civil Investigative Demand at 2-4 (July 1, 2025).

43. A press release dated November 20, 2024 from the Attorney General's office indicates that a CID was issued to Tyson Foods in Logansport investigating "human labor trafficking and indecent nuisances," and announces that his investigation was a product of the fact that the United States has "an open border and in influx of people coming over illegally by the millions." (Exhibit 2). The press release reports that "Attorney General Rokita said his investigation is focused on the coordinated efforts among international and local nonprofit 'refugee resettlement' organizations and employers, like Tyson Foods, to bring large number of migrants to Indiana." *Id*.

44. It has been reported that Attorney General Rokita also issued a CID to Su Casa, a Columbus, Indiana, nonprofit that serves Latin-American immigrants. Sheila Kennedy, THE INDIANA CITIZEN, *One Heartbeat Away*, December 3, 2024, https://indianacitizen.org/kennedy-commentary-rokita-again/ (last visited Sept. 15, 2025).

45. Because CIDs are not automatically public, it is possible that the Attorney General has issued additional CIDs to other organizations serving immigrant communities.

46. Due to the publicly touted issuance of these CIDs, Exodus is acutely aware that the Attorney General has been targeting the activities of groups that are attempting to assist immigrants and refugees in Indiana.

***<u>The CID issued by Attorney General Rokita to Exodus</u>***

47. On September 5, 2025, Attorney General Rokita did issue a CID to Exodus, although it was not received until September 8, 2025. (Exhibit 3).

48. The Attorney General has required that the CID be responded to by September 29, 2025.

49. Without providing any specific information regarding any basis for the CID, it states that the Attorney General has reasonable cause to believe that Exodus "may be in possession, custody, or control of documentary materials or may have knowledge of the facts that are relevant to an investigation being conducted concerning human labor

trafficking, indecent nuisances, false claims, and Exodus Refugee's abuse of authority as a nonprofit." (*Id.* at 1).

50. The CID demands that Exodus respond to 39 separate interrogatories and 28 separate requests for production of documents. (*Id.* at 8-17).

51. There is no explanation as to what is the "reasonable cause" that the Attorney General claims he has to issue the CID and there is no reasonable cause as Exodus has not engaged in, and has no information about, labor trafficking, indecent nuisances, or false claims. Nor has it abused its authority as a nonprofit and the bulk of the CID is not even directed toward those issues.

52. Instead, much of the CID is directed towards Exodus's advocacy efforts and its association with its immigrant and refugee clients. Among other things, in the interrogatories, the CID demands the following information concerning the services that Exodus provides to "migrants," defined by the CID as "an individual who is not a U.S. citizen or national and who is present in the United States with any kind of Legal Status or who is Unlawfully Present" (the paragraph numbers in the CID are listed):

3. all employers, non-profit organizations or other entities that it works with or interacts with concerning migrants and migrant services;

4. all employment-related programs it has maintained for the past three years;

5. all programs it has implemented related to the entry of migrants in the last three years;

8. all migrant services that it has provided or made available in the past three years, either on its own or in cooperation with other entities;

9. all migrant screening procedures it has utilized in the past three years, with "migrant screening procedures" defined as "any policy, procedure, process, standard, or guidance used to determine or evaluate the origin, destination, and/or legal or illegal status of Migrants; the background and identification documents of a Migrant; or the vulnerability of a Migrant to fraud, coercion, or exploitation;"

12. all funding Exodus has received in the past three years related to settlement of migrants;

14. all standards, practices, policies, procedures and/or guidance, formal or informal, used by Exodus concerning ICE;

16. all the times in the past three years when Exodus provided migrant services to a migrant who was unlawfully present in the United States;

17, 18. all instances in the past three years when Exodus was aware of a migrant unlawfully present in the United States who was employed by anyone;

22, 23. all communications in the last three years between Exodus, employers, and any entities concerning the entry or settlement of migrants in Indiana or their employment;

24, 25. all persons and organizations with which Exodus has had any communications concerning ICE operations, defined as activities engaged in by ICE in Monroe County between April 15, 2025 and May 15, 2025, including the identification of all such communications;

26-28. all persons and organizations with which Exodus has had any communications concerning ICE in the past three years, including the identification of all such communications, and all internal communications related to ICE in the past three years;

32-33. all actions taken by Exodus in the past three years to inform anyone of the presence or activities of ICE or any actions taken to attempt to stop, impede, or frustrate the work of ICE.

(Ex. 3 at 8-12).

53. And the CID demands the following documents from Exodus (the paragraph numbers in the CID are listed):

> 3. all documents concerning any programs it has implemented in the past three years concerning entry or settlement of migrants in the United States;
>
> 6-7. all documents it uses concerning its provision of migrant services and migrant screening procedures;
>
> 14-15. all documents in the past three years between it and any entity, including the United States, the State of Indiana, non-profit organizations, and others, concerning the entry or settlement of migrants in the United States or their placement with employers;
>
> 16-24. all documents related to ICE in the past three years including, but not limited to, ICE operations in Monroe County between April 15, 2025 and May 15, 2025 and any actions Exodus took to shut down its office or to instruct its employees not to come to work that day;
>
> 25. all documents relating to instances when it has provided or made available migrant services to a migrant who was unlawfully present in the United States.

(*Id.* at 14-19).

54. As can be seen, the CID basically demands a complete accounting of the advocacy work in which Exodus has engaged for the last three years, along with an overwhelming array of accompanying documents.

55. Inasmuch as one of the services Exodus provides is legal services, to the extent that the CID demands information and documents concerning all migrant services for the past three years, the CID is requiring the production of documents protected by the lawyer-client privilege.

56. Aside from legal matters, the CID demand records and information concerning the mental health counseling provided to Exodus's clients by the staff of Exodus.

57. The CID demands records and information concerning matters that Exodus's clients have disclosed with the understanding that they would not be shared beyond those for whom the client gave explicit written permission—such as immigration documents to be submitted to the United States that disclose personal information about the clients including their immigration status.

58. The CID demands information concerning strategy and communications that Exodus has engaged in with community partners.

59. The CID requires disclosure of the landlords and employers who have legally accommodated Exodus's clients and this may lead to the landlords and employers no longer being willing to work with Exodus or its' clients, which will have devastating impact on Exodus and its clients.

60. Disclosing the information sought in the CID, assuming Exodus could retrieve it, will be injurious to Exodus and its clients.

61. On the day that Exodus received the CID, September 8, 2025, Attorney General Rokita issued a press release announcing that the CID been issued to Exodus. (Exhibit 4).

62. The press release is punitive and accusatory in tone, describing Exodus as "a nonprofit that provides services to illegal aliens and others." (*Id.*). It also labels Exodus as one of the "organizations in Indiana . . . that appear to encourage or assist illegal

immigration," while stating that the Attorney General was investigating "labor trafficking." (*Id.*). The press release also notes that the Attorney General was "seek[ing] information about possible interference with federal immigration activities, in which entities in Monroe County may have engaged earlier this year." (*Id.*).

63. The press release resulted in numerous comments being posted to the Attorney General's Facebook page that were critical of Exodus and its clients, such as:

- "it's likely a safe bet that Soros is connected to this organization."
- "When they received money from Church World Service who got money from USAID, this investigation is past due."
- "Get them out and arrest all that hide or hinder illegals deportation."
- "Shut it all down and throw them in jail with a hefty fine too! Aiding and abetting is a crime."
- "I hope they open an investigation to anyone donating money for providing and giving Aid to our enemy anyone who cooperates trying permit Lawless invaders remaining is our enemy."

*See,* Todd Rokita, *BREAKING: INVESTIGATING POTENTIAL INTERFERENCE WITH IMMIGRATION ENFORCEMENT AND LABOR TRAFFICKING*, Facebook (Sept. 8, 2025), https://www.facebook.com/ToddRokitaIN.

64. The press releases and the CID make it clear that Exodus is being targeted not because it has behaved unlawfully but because of its association with immigrants and refugees, the advocacy efforts on behalf of its clients, and the communications it has had with its clients and on their behalf.

65. Exodus is being targeted because of its efforts to assist and empower the refugees and immigrants that it serves.

66. Exodus is being targeted because of the protected First Amendment activities and expression that it engages in to further its goals and mission and to assist its clients.

67. Responding to the 67 separate interrogatories and document requests, many of them requiring three years of information, would be enormously difficult and would greatly strain the limited resources of Exodus and would reduce its ability to communicate and associate with its clients and provide services.

68. Responding to the CID would impede Exodus's ability to further its goals and mission.

69. In the event that Exodus were required to respond to the CID, or if the Attorney General in any way seeks to enforce the CID, Exodus will be obligated to inform its clients, staff, and partner organizations—including landlords and employers that lawfully provide housing and jobs to immigrants—that it may be compelled to provide to the Attorney General their identities, communications, and a wide array of information for use in a highly politicized "investigation" that lacks any factual or legal basis. Providing this information to clients, staff, and partner organizations will predictably and inevitably result in numerous adverse consequences that will significantly harm Exodus's clients and its mission. Among other things: 1) clients may be reluctant to utilize Exodus's services at all; 2) Exodus's employees may be constrained in seeking and obtaining information from clients that is necessary to assist them as they know it may have to be shared with the Attorney General; 3) the landlords and employers who have worked with

Exodus's clients to lawfully house and employ them may be unwilling to do so; and 4) the partners who share information and strategy with Exodus concerning lawful support of the immigrant and refugee community may be reluctant to do so.

70. Exodus is being harmed by the issuance of the CID.

71. Exodus's activities are fully protected by the First Amendment and the Attorney General is retaliating against Exodus because it has engaged in these constitutionally protected activities.

72. The Attorney General's sweeping and burdensome retaliatory CID would deter a person or entity of ordinary firmness in Exodus's position from engaging in the expressive, communicative, and associational activity that has given rise to the CID as the person or entity would reasonably believe, based on the Attorney General's past conduct, that their activities would result in a similar CID.

73. Exodus is being caused irreparable harm for which there is no adequate remedy at law.

74. At all times defendant has acted under color of state law.

**Legal claim**

75. The civil investigative demand served on Exodus violates the First Amendment.

**Request for relief**

WHEREFORE, Exodus Refugee Immigration, Inc. requests that this Court:

a. accept jurisdiction of this case and set it for hearing at the earliest opportunity;

b. declare that defendant has violated the First Amendment for the reasons noted above;

c. enter a preliminary injunction, later to be made permanent, enjoining defendant from enforcing the civil investigative demand that he has served on plaintiff;

d. award plaintiff its costs and reasonable attorneys' fees;

e. award all other proper relief.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
Joshua T. Bleisch
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-410
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org
jbleisch@aclu-in.org

Attorneys for Plaintiff