**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

EXODUS REFUGEE IMMIGRATION, INC.,      )
                                        )
              Plaintiff,                )
                                        )
       v.                               )      Case No. 1:25-cv-01885-TWP-CSW
                                        )
TODD ROKITA, in his official capacity as the   )
Attorney General of the State of Indiana,      )
                                        )
              Defendant.                )

**ORDER ON DEFENDANT'S MOTION TO DISMISS AND**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Exodus Refugee Immigration, Inc. ("Exodus"), is a non-profit organization that provides services to immigrants, including refugees, migrants, and other noncitizens. In September 2025, Indiana Attorney General Todd Rokita ("Rokita") served a Civil Investigative Demand on Exodus, purportedly to investigate labor trafficking and other offenses. The Civil Investigative Demand directs Exodus to produce 39 categories of information and 28 groups of documents related to Exodus's activities, services, clients, partner organizations, and donors. Exodus filed this action under 42 U.S.C. § 1983 to enjoin Rokita from enforcing the Civil Investigative Demand, alleging it violates Exodus's First Amendment rights. This matter is now before the Court on Rokita's Motion to Dismiss filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Filing No. 30), and Exodus's Motion for Preliminary Injunction (Filing No. 10). For the reasons explained below, Rokita's Motion to Dismiss is **denied.** The Court determines that Exodus has a strong likelihood of success on its claims, has no adequate remedy at law, and faces irreparable harm if Rokita is not enjoined, accordingly, Exodus's Motion for Preliminary Injunction is **granted**.

## I.    LEGAL STANDARDS

### A.    Motion to Dismiss Under Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of proof is on the plaintiff, the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id.*

When ruling on a motion to dismiss for lack of subject-matter jurisdiction, "the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citation omitted). Further, "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation modified).

### B.    Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation modified). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## C.   **Motion for Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain a preliminary injunction, the party seeking the injunctive relief must demonstrate:

> [(1)] that it has some likelihood of success on the merits of its claim; [(2)] that it has no adequate remedy at law; [and (3)] that without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation modified). "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, Inc., 695 F.3d 676, 678 (7th Cir. 2012) (citation modified). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.    BACKGROUND

### A.    Exodus

Exodus is a longstanding Indiana non-profit corporation with offices in Indianapolis and Bloomington. It is "dedicated to the protection of human rights" and advances its mission "by serving the resettlement needs of refugees and other displaced migrants" through the provision of various assistance, services, and resources (Filing No. 1 ¶¶ 1, 8). Exodus provides services to immigrants regardless of their immigration status. *Id.* ¶¶ 18–19. It has been approved to assist in the resettlement of refugees under the Refugee Act of 1980 and receives federal funding through the Church World Service and Indiana Family and Social Services Administration. *Id.* ¶ 35.

Some of Exodus's clients are allocated to Exodus through Church World Service (Filing No. 35-1 ¶ 13). Many others become clients through an open intake process, during which a person can walk in and discuss their needs, and Exodus staff will determine if and how they can help (Filing No. 1 ¶ 20). Exodus's staff, which include lawyers and paraprofessionals, provide a variety

of services, like assisting with adjusting immigration statuses, asylum, citizenship, and family reunification. *Id.* Staff also offer seminars on the rights of noncitizens. *Id.* ¶¶ 23–24. In addition, Exodus provides legal, mental health, and case management services; assistance obtaining housing, food, and clothing; connection to social services benefits, banking, and employment; and English language and cultural orientation classes. *Id.* ¶ 25.

Exodus regularly communicates with the federal government about its clients, and those communications often involve sharing private and confidential documents. Exodus's clients sign releases authorizing the disclosure of their private information to designated entities and agencies; the Indiana Attorney General is not one of them. Clients provide their private information to Exodus with the understanding that it will not be shared outside the terms of their signed releases. *Id.* ¶ 28. One reason clients do not want their information shared is the fear that, because they are immigrants, they or their families may face retaliation (Filing No. ¶ 38).

In addition to providing services and resources, Exodus cultivates and maintains relationships with landlords and employers who are willing to house and employ noncitizens with lawful status and work authorizations (Filing No. 35-1 ¶ 27, 32). Exodus's relationships with these landlords and employers are valuable, in part, because they are essential to Exodus's work to transition its clients to self-sufficiency. *Id.* ¶ 60. These relationships are also valuable because they are rare. Many landlords are hesitant to rent to noncitizens, and many employers are hesitant to hire noncitizens because they are often not fully proficient in English and/or have limited or no work experience in the United States. *Id.* ¶¶ 27, 32. Exodus keeps the identities of these partners private, as negative publicity might deter them from working with Exodus in the future. *Id.*

Exodus also engages in extensive advocacy work concerning immigrant and refugee issues, often in conjunction with other like-minded organizations. *Id.* ¶ 31. Exodus communicates

regularly with these organizations "to discuss strategy, cooperation, and ways to better serve its clients." *Id.* ¶ 32. Exodus participates in organized protests, communicates with other participants about protests, and frequently speaks to houses of worship and community groups about immigrant and refugee issues and about Exodus's functions. *Id.* ¶¶ 33–34, 43. Exodus's staff also frequently communicate with state-wide agencies and organizations that advocate to policymakers about immigrant and refugee issues. *Id.* ¶¶ 40–42; (Filing No. 1 ¶¶ 29–38).

## B.    Civil Investigative Demands

The Indiana Attorney General may issue a Civil Investigative Demand ("CID") if he "has reasonable cause to believe that a person may be in possession . . . of documentary material, or may have knowledge of a fact that is relevant to an investigation conducted to determine if a person is or has been engaged in a violation" of enumerated Indiana statutes. Ind. Code § 4-6-3-3(a). The CID may require its recipient to produce documents, answer interrogatories, and appear and testify under oath. *Id.* The recipient must comply within the time set by the Attorney General, but the CID is not immediately enforceable—*i.e.*, it is not "self-executing." If the recipient does not timely comply, the Attorney General may file an action in an Indiana trial court to enforce the CID. The CID may be enforced only if the state court issues an appropriate order. Ind. Code § 4-6-3-4(2).

## C.    November 2024 CIDs to Organizations Linked to Immigrants

In November 2024, Rokita began issuing CIDs to several Indiana organizations with some type of connection to immigrants. Based on available information, these organizations include the Logansport Community School Corporation, Cass County Health Department, Jackson County Industrial Development Corporation, Tyson Foods, Tent Partnership for Refugees, Haitian Center of Evansville, Su Casa, God is Good Foundation, and Berry Global. The God is Good Foundation, ceased its refugee resettlement efforts after receiving the CID. *Id.* ¶¶ 39, 41–45.

6

CIDs are not automatically public. There is no announcement that a CID has been propounded unless the Attorney General issues a press release, which Rokita chose to do in this case. *Id.* ¶ 45; (Filing No. 35-2 at 60:19–61:9, 63:24–64:2). Rokita announced that the November 2024 CIDs were motivated by a perceived "largescale influx of illegal aliens and 'legal migrants'" into Indiana, which Rokita believes "create[] serious sex and labor trafficking risks," cause "indecent nuisances," and "impose[] unsustainable costs" (Filing No. 1-1; Filing No. 1-2).

Two recipients of Rokita's 2024 CIDs, Berry Global Group and Haitian Center of Evansville, did not respond, so Rokita initiated enforcement actions against them. *Rokita v. Berry Glob. Grp., Inc.*, No. 82D03-2504-MI-002439 (Vanderburgh Super. Ct.); *Rokita v. Haitian Ctr. of Evansville*, No. 82D06-2506-MI-0003471 (Vanderburgh Super. Ct.).[1] In October 2025, the state court found that the CIDs did not meet the "low" standard set by Indiana law and denied Rokita's petitions to enforce the CIDs. Order, *Berry Global*, No. 82D03-2504-MI-002439 (Vanderburgh Super. Ct. filed Oct. 8, 2025). Rokita appealed the denial to the Indiana Court of Appeals. *Rokita v. Berry Global Grp.*, No. 25A-MI-02817 (Ind. Ct. App. Nov. 11, 2025).

**D.    2025 ICE Operations in Bloomington**

Exodus and its clients, both with and without lawful status, understand that the United States Immigration and Customs Enforcement ("ICE") has recently "ramped up" efforts to remove immigrants from the country. Exodus's clients are also aware of reports that immigrants with lawful status, and even citizens, have been detained by ICE, so they want to avoid ICE interactions whenever possible (Filing No. 35-1 ¶¶ 45–46). Exodus is also mindful of ICE's presence in Indiana, and that the nature of Exodus's mission "may attract ICE's attention." *Id.* ¶ 47.

---

[1] The Haitian Center action is not publicly available, but has since been consolidated into the public Berry Global action, so information about the Haitian Center action is found in court records for the Berry Global action. *See* Mot. to Intervene, *Berry Glob.*, No. 82D03-2504-MI-002439 (Vanderburgh Super. Ct. June 13, 2025).

In February 2025, Exodus became concerned that ICE would target its Indianapolis office and its clients, so Exodus closed its Indianapolis office for roughly two weeks. Exodus publicized what it was doing and indicated that it wanted to prevent clients from panicking and prevent clients being confronted by ICE. *Id.* ¶ 48.

In April 2025, Exodus received a tip about a potential ICE operation in Bloomington. *Id.* ¶ 49. An Exodus employee called twenty-two other social services organizations in the area to tell them about the operation, though many already knew. *Id.* Exodus decided to close its Bloomington office for three days, again to prevent panic and limit confrontations by ICE. *Id.* ¶ 50. Exodus told only a few clients, all of whom regularly visited the Bloomington office and had legal status, about the closure. Exodus did not tell any clients why the office would be closed. *Id.* ¶¶ 50–51.

Rokita's Office was not involved in the ICE operation. But, in May 2025, after the operation, an unidentified ICE agent called and texted Blake Lanning ("Lanning"), an attorney with the Office of the Attorney General (Filing No. 35-2 at 17:5–18:24). During a phone call, the ICE agent told Lanning that the operation had not yielded as many arrests as ICE had hoped. The agent believed that the operation had been unsuccessful because several organizations, including Exodus, had alerted the community to ICE's presence, resulting in targeted individuals taking steps to evade apprehension. *Id.* at 17:18–18:5; (Filing No. 48-1 at 14–15). The ICE agent stated that Exodus may have instructed its employees to work remotely and told clients not to come to the office while it was closed. The agent also expressed ICE's belief that these communications may indicate that Exodus employs and/or provides services to "illegal aliens." (Filing No. 35-2 at 26:7–19). Of the organizations mentioned during the call, only Exodus received a CID. *Id* at 20:10–19.

### E.    CID Issued to Exodus

On September 5, 2025, Rokita sent the CID at issue to Exodus (Filing No. 1 ¶ 47; Filing No. 1-3). The CID states that the Office of the Attorney General "has reasonable cause to believe

8

that [Exodus] may [have documents or information] relevant to an investigation being conducted concerning human labor trafficking, indecent nuisance, false claims, and Exodus Refugee's abuse of authority as a nonprofit under Indiana Code § 23-17-24-1." (Filing No. 1-3 at 1). The CID does not explain the "reasonable cause" purportedly authorizing the CID.

In subsequent court filings, Rokita explains the two reasons for issuing the CID. First, Rokita issued the CID to investigate Exodus's potential violations of the Indiana False Claims Act and Indiana's non-profit laws. As mentioned above, it was ICE's belief that Exodus's communications about the ICE operation in Bloomington "may indicate that Exodus employs and/or provides services to illegal aliens." (Filing No. 48-1 at 15). The knowing employment of an illegal alien by a state contractor (which Exodus is) may violate the state False Claims Act; and an organization may violate Indiana's non-profit statute by violating a federal criminal statute, like 8 U.S.C. § 1324, which prohibits concealing or attempting to conceal an unlawful immigrant from arrest (Filing No. 48-1 at 15; Filing No. 31 at 11–12). Second, Rokita issued the CID to aid his investigation of human labor trafficking. Rokita does not contend that Exodus has engaged in labor trafficking but asserts that Exodus may have relevant information simply because it works with migrants, including trafficking victims (Filing No. 48-1 at 19; Filing No. 12 at 38–39).

The CID demands that Exodus respond to 39 interrogatories and 28 requests for production of documents. Many of the interrogatories seek information about Exodus's services to "Migrants," defined as any noncitizen who is present in the United States, regardless of legal status, (Filing No. 48-1 at 7), and "Migrant Services," which is defined to encompass "everything that Exodus does for its clients" (Filing No. 35-2 at 56:1–5). The CID seeks, in part, information about:

> 3.      . . . any and all Employers, non-profit organizations, or other entities with which Exodus Refugee works, partners, cooperates, or interacts concerning Migrants and/or Migrant Services. . . .

8.      . . . any and all Migrant Services that Exodus Refugee has provided or made available, either on its own or in cooperation with other entities, in the past three (3) years. . . .

12.     . . . any and all funding or financial or non-financial benefits that Exodus Refugee has received in the past three (3) years related to the entry and/or settlement of Migrants in the United States . . . or the recruitment, placement, or pairing of Migrants with Employers. . . .

24–28. . . . [each] written or oral communication [with any person, non-profit organization, or other entity] that Exodus Refugee has had concerning [ICE or] ICE Operations [in Monroe County between April 15, 2025, and May 15, 2025].

(Filing No. 1-3 at 8–11, ¶¶ 3, 8, 12, 24–28). The CID also demands that Exodus produce:

6.      . . . any and all documents, . . . related to Migrant Service provided or made available by Exodus Refugee. . . .

9–10.   . . . any and all documents . . . [and all internal and external communications] concerning the safety and well-being of Migrants. . . .

14–15. . . . all documents related to consultations or communications in the past three (3) years between Exodus Refugee and federal, state, or local authorities [or Employers, non-profit organizations, and/or other entities] concerning the entry and/or settlement of Migrants in the United States . . . and/or Migrants' recruitment, pairing, or placement with Employers.

16–23. . . . any and all documents [and communications] . . . related to ICE and/or ICE Operations [in Monroe County between April 15, 2025, and May 15, 2025].

*Id.* at 14–16, ¶¶ 6, 9–10, 14–23. The CID excludes documents withheld on the basis of privilege, but it does request detailed information about each withheld document. *Id.* at 3–4.

On the day Exodus received the CID, Rokita issued a press release about the CID and his ongoing investigations (Filing No. 1-4). The press release describes Exodus as "a nonprofit that provides services to illegal aliens and others." And, although Rokita's court filings do not accuse Exodus of engaging in or aiding labor trafficking, his press release describes Exodus as one of the "organizations in Indiana . . . . that appear[s] to encourage or assist illegal immigration." *Id.* at 1. The press release was also posted on Rokita's public Facebook page. The post yielded several comments, many of which were critical of Exodus and its clients (Filing No. 35-3 at 3–9).

10

Despite the CID becoming public via Rokita's press release, Exodus at first did not discuss the CID with clients because it did not want to panic clients or make them wary of Exodus (Filing No. 35-1 ¶ 65). However, starting in November 2025, after Rokita had initiated a state court enforcement action, Exodus's staff began informing clients "that the Attorney General is looking at Exodus and its records and that it is possible that the organization will have to turn over information concerning clients to the Attorney General." *Id.* ¶ 66. Exodus alleges that having to disclose this information has harmed the trust between clients and Exodus's staff, hindering their ability to perform their roles. *Id.* ¶ 69. One client who had been receiving legal assistance became reluctant to discuss their situation upon learning of the CID. *Id.* ¶ 67. Two prospective clients decided to enroll in Exodus's legal services despite knowing about the CID (Filing No. 50-1 at 261:3–12)), but at least eleven others declined case management services after being told about it (Filing No. 49-1 at 195:19–24 (three denials at appointments intake); Filing No. 57-1 ¶ 4 (eight denials out of sixteen intake appointments)). Exodus also states that the looming threat of the CID harms its ability to strategize internally and with partners about the best ways to fulfill Exodus's mission and serve the immigrant community. *Id.* ¶ 70.

**F.      Resulting Lawsuits and Procedural History**

The CID required Exodus to respond by no later than September 29, 2025 (Filing No. 1-3 at 2). Exodus did not respond. On September 19, 2025, it initiated this lawsuit and filed its Motion for Preliminary Injunction (Filing No. 1; Filing No. 10). Exodus alleges that the issuance and enforcement of the CID violate the First Amendment because it was issued in retaliation for Exodus's protected activity and because its wide-ranging demand impinges on Exodus's associational and expressive rights without proper justification (Filing No. 1 ¶¶ 64–65).

In October 2025, the parties filed competing proposed scheduling orders on Exodus's Motion for Preliminary Injunction. Rokita asked for a stay of discovery and preliminary injunction

briefing pending an anticipated motion to dismiss. On October 21, 2025, the Court declined to stay proceedings and set briefing deadlines on the Motion for Preliminary Injunction (Filing No. 21).

The next week, Rokita initiated a state court enforcement action against Exodus. *Rokita v. Exodus Refugee Immigr., Inc.*, No. 49D05-2510-MI051693 (Marion Super. Ct.) (the "State Court Action"). On November 17, 2025, Exodus moved the state court for a stay pending a ruling on the instant Motion for Preliminary Injunction. Shortly thereafter, Rokita filed his federal Motion to Dismiss (Filing No. 30) and a response to Exodus's motion to stay in the State Court Action, which incorporated his federal Motion to Dismiss. In early December 2025, the state court granted Exodus's motion to stay. *See* Order Granting Stay, *Exodus*, No. 49D05-2510-MI051693 (Marion Super. Ct. Dec. 3, 2025).

Rokita's federal Motion to Dismiss became fully briefed on December 23, 2025. Due to some unanticipated discovery disputes, Exodus's earlier-filed Motion for Preliminary Injunction was not fully briefed until February 4, 2026. On May 2, 2026, Exodus filed the instant Motion to Submit Supplemental Authority. All three motions are now ripe for the Court's review.

## III.    DISCUSSION

Two motions are before the Court, Rokita's Motion to Dismiss and Exodus's Motion for Preliminary Injunction. The arguments raised in both motions overlap substantially, so rather than discussing each motion separately, the Court organizes its discussion by argument, beginning with Rokita's threshold arguments on standing and ripeness, then abstention, and lastly the parties' arguments on each element of a preliminary injunction.

### A.    Standing and Ripeness

Article III of the United States Constitution limits federal courts to resolving "cases" and "controversies." U.S. Const. art. III, § 2. This limitation "requires a claim that is ripe and a plaintiff who has standing." *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007). These

12

concepts are distinct but related: "[w]hereas ripeness is concerned with when an action may be brought, standing focuses on who may bring a ripe action." *Id.* (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996)).

To establish standing, a plaintiff must allege it suffered (1) an injury in fact, (2) that is fairly traceable to the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 639 (7th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). A claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). Redressability is not disputed. The Court addresses injury/ripeness and traceability in turn.

1. **Injury and Ripeness**

Whether framed as an issue of standing or ripeness, an injury must involve "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). Rokita contends that Exodus cannot show an injury-in-fact or ripeness because any potential future injury stemming from the CID is contingent on Rokita enforcing the CID, which he may not yet do (Filing No. 31 at 15–19). Exodus responds that it may contest the CID because Rokita is likely to enforce it, and also because the "chilling" effect of the CID establishes a constitutional injury and ripe claim (Filing No. 38 at 10–15). For purposes of the instant motions, the Court will only address Exodus's "chilling" theory, because earlier this year, the Supreme Court provided thorough guidance on this issue in a strikingly similar case.

In *First Choice Women's Resource Centers, Inc. v. Davenport*, the New Jersey Attorney General served a civil subpoena on First Choice Women's Resource Centers, Inc., a religious nonprofit organization that provides resources to pregnant women. 146 S. Ct. at 1119. The

subpoena directed First Choice to disclose information about all of its donors, with limited exception. *Id.* at 1120. First Choice, like Exodus, did not respond. Instead, two days before the response deadline, First Choice filed a federal lawsuit and moved to enjoin enforcement of the subpoena. Shortly thereafter, the New Jersey Attorney General— like Rokita—filed his own state court lawsuit. *Id.* The district court dismissed the federal suit, finding that First Choice lacked standing. A divided Third Circuit affirmed the dismissal.

A unanimous Supreme Court reversed, agreeing with First Choice that the mere issuance of the subpoena caused First Choice to suffer an actual and ongoing injury to its First Amendment rights. *Id.* at 1122. In reaching this decision, the Court reiterated the importance of citizens' First Amendment freedom to associate and summarized the long line of cases scrutinizing government demands for donor and member information. *Id.* at 1122–24. The Court stated that "[a]gainst this backdrop, the question before us all but answers itself. First Choice has established a present injury to its First Amendment associational rights." *Id.* at 1124. The subpoena's threat of penalties for noncompliance; the risk that private donor information might be disclosed, coupled with the Attorney General's negative rhetoric about pro-life groups; and two unrebutted declarations about the potential harm to First Choice's ability to recruit and keep donors, were "more than enough to establish injury in fact under [Supreme Court] precedents." *Id.* at 1124–25.

With *First Choice* in mind, the Court addresses Rokita's specific arguments. Rokita first argues that because the CID is not "self-executing" (*i.e.*, it is not enforceable absent court order), the "potential harms from disclosure are mere possible future injuries." (Filing No. 31 at 16; Filing No. 52 at 14–16). The Supreme Court rejected this argument in *First Choice*, and so must this Court. 146 S. Ct. at 1127. It is well established that a plaintiff "need not wait for the damage to occur before filing suit," *Mahmoud v. Taylor*, 606 U.S. 522, 560 (2025), and the risk that sensitive,

14

private information may be disclosed can reasonably chill First Amendment activity. As the *First Choice* Court explained, regardless of whether the CID's penalties are immediately enforceable, "the most [Exodus can] say to existing and prospective donors[, partners, or clients] after receiving [the CID is] that their privacy might be protected—or it might not. Objectively reasonable people interested both in their privacy and in associating with [Exodus] would 'not lightly disregard' such a distinct possibility of disclosure." 146 S. Ct. at 1128 ("[T]he value of a sword of Damocles is that it hands—not that it drops." (alteration in original) (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting))). The fact that Exodus has disclosed certain client information to certain federal authorities does not alter this analysis, since Exodus is concerned with protecting private information from disclosure to the state Attorney General—not federal authorities—and because Rokita seeks a broad swath of information well beyond any information shared with federal authorities (Filing No. 52 at 20–21).

In support of his position that a non-self-executing subpoena cannot cause a First Amendment injury, Rokita cites *Reisman v. Caplin*, 375 U.S. 440 (1964), in which the plaintiffs lacked standing to challenge a non-self-executing federal administrative subpoena. But in *Reisman*, the plaintiffs "complained only of future injuries they might face if a court enforced the subpoena" and did not allege an injury from the subpoena itself. *First Choice*, 146 S. Ct. at 1128–29. The *First Choice* Supreme Court found *Reisman* to be inapt in cases "where a plaintiff suffers ongoing injuries from the subpoena itself." *Id.* at 1129. As such, *Reisman* is inapt here. *Id.* at 1129. Rokita also cites two circuit court decisions in support of his position, but those cases rely on *Reisman* and pre-date *First Choice*, so they are not persuasive. (Filing No. 31 at 16–18 (citing *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022); *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)); Filing No. 52 at 15–16).

Rokita next argues that even if a civil subpoena can cause objectively reasonable chill, the CID in this case did not (Filing No. 31 at 19–21; Filing No. 52 at 17–19). But Exodus offers the same evidence of objectively reasonable chill that the Supreme Court found to be sufficient in *First Choice*. The CID directs Exodus to disclose 39 categories of information and 28 groups of documents, including, but not limited to, all communications and documents concerning "the safety and well-being of Migrants" (Filing No. 1-3 at 15), a list and description of "all Employers, non-profit organizations, or other entities with which Exodus Refugee works, partners, cooperates, or interacts concerning Migrants and/or Migrant Services," *id.* at 8, and a list and description of "any and all funding or financial or non-financial benefits that Exodus Refugee has received in the past three (3) years related to the entry and/or settlement of Migrants in the United States . . . or the recruitment, placement, or pairing of migrants with Employers," *id.* at 9. *See First Choice*, 146 S. Ct. at 1124 (requesting the name, address, phone number, and place of employment of all donors from all but one donation source).

Rokita contends that his CID is distinguishable from the *First Choice* subpoena because the CID here "does not seek to obtain information about the identity of Exodus Refugee's donors" and instead seeks information about Exodus's "clients who may be victims of criminal activity and third-party organizations with which Exodus Refugee may have communicated." (Filing No. 62 at 2). This attempt to distinguish *First Choice* fails for two reasons. First, it inaccurately describes the CID, which requests a plethora of information and documents that *does* include donor information. *See id.* ("[T]he Attorney General seeks, *among other things*, information about Exodus's Refugee's [*sic*] clients . . . ." (emphasis added)). As an example, the CID requests a list and description of "any and all funding or non-financial benefits" that Exodus has received in the last three years "related to the entry and/or settlement of Migrants." (Filing No. 1-3 at 9). Seeing

as migrant resettlement is Exodus's core mission, all of Exodus's funding information would likely fall within the scope of this request. The CID also demands that Exodus produce "any and all documents . . . related to Migrant Services" (Filing No. 1-3 at 14), which Rokita interprets to include all of Exodus's services (Filing No. 35-2 at 56:1–5). The CID in this case, which is substantially broader than the *First Choice* subpoena, certainly requests donor information.

Second, the Supreme Court has never suggested that only requests for information on donors—as compared to clients or partners—can infringe associational rights, and Supreme Court precedent holds otherwise. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (holding that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association"). Rokita argues that the First Amendment does not protect a "generalized right of 'social association,'" as recognized in *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), but *Stanglin* is inapposite. There, the Supreme Court held an age-limit ordinance for dance halls did not infringe the dancers' rights to associate with people of other ages. *Id.* at 20–22. The *Stanglin* Court explained that most dance hall attendees "are strangers to one another," and do not "take positions on public questions" or engage in "the sort of expressive association that the First Amendment has been held to protect." *Id.* at 25. Exodus and its clients, donors, and partners, by contrast, are not mere patrons of the same social establishment. Their association is organized and revolves around the type of political and expressive association traditionally protected by the Constitution. So even if the CID did not request donor information (which it does), its request for client and partner information may also infringe Exodus's First Amendment rights.

Exodus also offers evidence that it maintains and protects a variety of private information, and the threat of having to disclose its private information "for use in a highly politicized 'investigation'" will significantly harm its clients and its mission because it may make clients

17

reluctant to utilize Exodus's services, make Exodus's staff cautious about seeking or collecting information from clients, and deter existing or potential partners from working with Exodus and/or sharing information with Exodus (Filing No. 1 ¶¶ 26–30, 54–59, 69; Filing No. 35-2 at 64:3–7 (conceding that publicizing the issuance of a CID may have negative consequences for the CID's recipient)); *First Choice*, 146 S. Ct. at 1124–25.

In his campaign to obtain this information, Rokita has publicly accused Exodus, its clients, and its partners of engaging in, assisting, or having knowledge of human trafficking, nuisance, fraud, abuses of nonprofit laws, and unlawful interference with law enforcement activities. *See First Choice*, 146 S. Ct. at 1125 ("The Attorney General had publicly called pro-life groups 'extremists' and suggested that 'charges' might be brought against them." (citation modified)). The September 2025 press release also contains quotes by Rokita reiterating his speculation that organizations like Exodus are worsening "significant public safety risks, including increased concerns about labor trafficking." (Filing No. 1-4). Rokita amplified these accusations by posting a link to the September 2025 press release on his public Facebook page, and by restating that he is "investigating potential interference with immigration enforcement and labor trafficking . . . [by] issu[ing] a civil investigative demand to Exodus." (Filing No. 35-3 at 3 (capitalization omitted)).

The Court has considered the unrebutted affidavit from Exodus's Executive Director and CEO which states that few landlords and employers are willing to rent to or hire noncitizens, and even fewer wish to advertise that they are so willing. (Filing No. 35-1 ¶¶ 27, 32). Exodus avers that their partners likely will be more reluctant or unwilling to partner with Exodus once they learn that their identities could be disclosed to the Attorney General. *Id.* ¶¶ 59–60. And given the limited number of landlords and employers who work with noncitizens, losing these partnerships would be "devastating to Exodus's work." *Id.* ¶ 60. The negative publicity resulting from Rokita's

18

September 2025 press release has caused Exodus reputational harm that may result in private foundations becoming reluctant to continue funding Exodus at their current levels, or at all. *Id.* ¶ 56. The Executive Director asserts that "[t]he knowledge that the Attorney General has asserted a right to obtain [the requested] information will undoubtedly cause some donors to look for a less 'controversial' not-for-profit to support." *Id.* ¶ 58; *First Choice*, 146 S. Ct. at 1125 ("First Choice asserted, the '*risk* of loss of donors . . . greatly jeopardizes [its] ability to carry out its religious mission.'" (emphasis added; omission and alteration in original)).

Also important is the CID's effect on Exodus's clients and staff. The Executive Director states that noncitizens "are extremely concerned about doing anything that alerts any authority to their presence, particularly when the authorities, including the Attorney General, have demonstrated hostility towards immigrants. . . . These concerns and noncitizens' desire to remain as anonymous as possible have only been increasing as ICE raids have ensnared not only those without status but, according to news reports, even those with status, and even U.S. citizens." (Filing No. 35-1 ¶¶ 61–63). Upon being told about the CID, several clients either became reluctant to openly speak with Exodus or declined services altogether. *Id.* ¶ 66–68; (Filing No. 57-1 ¶ 4; Filing No. 49-1 at 195:19–24). Exodus's staff have also been hindered in their ability to have candid communications among each other and with partners and clients, since staff do not want to obtain information that they know might later be turned over to a third party (Filing No. 35-1 ¶¶ 69–70).

Rokita argues that Exodus's affidavit is insufficient to establish an injury-in-fact because, unlike the declarations in *First Choice*, Exodus has not reported an actual decrease in funding since the CID's issuance (Filing No. 62 at 3). However, Exodus's affidavit does allege that the CID's issuance, combined with the language used in the CID and by Rokita publicly, may deter donors from associating with Exodus, much in the same way the *First Choice* declarations did. *Compare*

19

(Filing No. 35-1 ¶ 58), *with First Choice*, 146 S. Ct. at 1121 (citing declaration from First Choice's executive director stating that the subpoena "threatened to 'weaken [First Choice's] ability to recruit new donors'" (alteration in original)). The *First Choice* Court did not hold that an organization's associational rights are harmed *only* once donor relationships are *actually* affected. *First Choice*, 146 S. Ct. at 1125 ("Our cases have long recognized that demands for a charity's private member or donor information have just that effect. . . . All this occurs not just when a demand is enforced, but when it is made and for as long as it remains outstanding." (citation modified) (alteration omitted) (citing *NAACP*, 357 U.S. at 460–63)). The test is objective, so the actual response of some of Exodus's donors to the CID, to date, is immaterial.

Further, "courts may make commonsense inferences when assessing Article III standing, including inferences about third party behavior." *Id.* (citation modified) ("[E]ven if a subpoena targeting First Amendment activity is never enforced in court, [it] will give its targets a very good reason to clam up [and] give the target organization's members and supporters a very good reason to abandon the cause. . . . Worse, *amici* represent, officials across the political spectrum have sometimes issued subpoenas and other investigatory demands in order to secure just these results." (alterations in original) (citation modified)). Under the facts of this case, the Court can reasonably infer that Rokita's demand for private information about Exodus's donors, its noncitizen clients, and the business partners who assist those noncitizens, will deter those donors, clients, and partners from associating with Exodus, thereby burdening Exodus's protected First Amendment rights. All of the above "is more than enough to establish injury in fact under [Supreme Court] precedents." *First Choice*, 146 S. Ct. at 1125.

Rokita's ripeness argument fails for similar reasons. His argument, and the caselaw he cites, relies on the presumption that the mere issuance of a non-self-executing CID does not harm the

20

CID's recipient, and that a state court action regarding the CID's enforceability would provide the recipient with an adequate remedy at law. *See Google*, 822 F.3d at 225 (finding that claim was not ripe because state subpoena was not yet enforceable); *Twitter*, 56 F.4th at 1176–77 (finding that Twitter's allegations failed to establish standing and ripeness because it could not identify an injury arising from the non-self-executing CID's mere issuance). *First Choice* negates that presumption. As explained above, Exodus has adequately alleged that it has, and continues to, suffer a legally cognizable injury as a result of the CID's issuance. Its injuries are not contingent or purely hypothetical. Exodus's claims were therefore ripe as of the date this action was filed.

### 2. **Traceability**

In response to Exodus's Motion for Preliminary Injunction (but not his Motion to Dismiss), Rokita disputes traceability. *Id.* at 19–20. In short, Rokita contends that Exodus—not Rokita—is to blame for its clients' and partners' reactions to the CID because Exodus is the one who told them about the CID. There is simply no legal support for this argument. Rokita cites only *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), which is readily distinguishable. In that case, the plaintiffs claimed that they suffered injuries in the form of costly measures taken to protect their communications from government surveillance, which plaintiffs' claims were fairly traceable to the Foreign Intelligence Surveillance Act of 1978 ("FISA"). *Id.* at 401. The Supreme Court disagreed, finding that the plaintiffs' traceability theory relied on a "chain of contingencies—which amounts to mere speculation about whether surveillance would be under [FISA] or some other authority." *Id.* at 410. The *Clapper* Court held that the respondents could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416. Here, by contrast, the harm to Exodus is not purely hypothetical, nor is it tied to a chain of contingencies. Rokita actually issued the CID (and

announced it publicly), which, as explained above, would discourage reasonable individuals and entities from associating with Exodus.

Moreover, Rokita's understanding of traceability is too strict. "A plaintiff's burden on this element is relatively modest at this stage of the litigation. To satisfy that burden, the plaintiff need not establish that the defendant's conduct was the most immediate cause, or even a proximate cause, of the plaintiffs' injuries." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). "Article III requires no more than a meaningful connection between" the defendant's conduct and the plaintiff's injury. *Id.* (citing *Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 502 (7th Cir. 2024)) (quotations omitted and cleaned up). There is certainly a meaningful connection between Rokita's issuance of the CID and the alleged chill caused by the CID's issuance, regardless of how Exodus's clients and partners learned about the CID. Exodus has established traceability.

Exodus has met all elements of Article III standing, and its claims are ripe. Rokita's Motion to Dismiss based on lack of standing and ripeness is **denied**.

## B.      <u>Abstention</u>

Rokita next argues that under *Younger v. Harris*, 401 U.S. 37 (1971), and general principles of federalism, this Court should abstain from exercising jurisdiction over Exodus's claims because the CID is currently the subject of the State Court Action (Filing No. 31 at 21–22).[2] Exodus responds that the State Court Action does not fit within the narrow categories of proceedings to

---

[2] Rokita raises abstention only in his Motion to Dismiss, though he attempts to incorporate this argument into his response to the Motion for Preliminary Injunction via footnote (Filing No. 52 at 21 n.9). Such attempts are discouraged and may result in a finding of waiver and/or sanctions for circumventing the Local Rules' page limits. (Filing No. 57 at 7–8); *see Fleming v. Cnty. of Kane*, 855 F.2d 496, 498 (7th Cir. 1988) (sanctioning counsel for circumventing page limits, including by overuse of footnotes); *CSX Transp., Inc. v. Zayo Grp., LLC*, No. 21-cv-02859, 2024 WL 1743156, at *9 n.6 (S.D. Ind. Apr. 23, 2024) (construing use of 41 footnotes as an attempt "to circumvent page limitations").

which *Younger* applies, and general principles of federalism do not compel abstention here (Filing No. 38 at 15–23).[3] The Court agrees with Exodus.

### 1. *Younger* Abstention

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 817 (1976). In *Younger*, the Supreme Court recognized that an exception to this obligation exists when there is a parallel state criminal prosecution. Although the Supreme Court has since extended *Younger* to other types of civil actions, it has reaffirmed that "'only exceptional circumstances . . . justify a federal court's refusal to decide a case in deference to the States.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 70 (2013) (quoting *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989)). Those exceptional circumstances are: (1) ongoing state criminal prosecutions; (2) certain "civil enforcement proceedings" that are "akin to criminal prosecution" in "important respects"; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 73, 78. *Younger* extends to these three circumstances, "but no further." *Id.* at 82.

The Seventh Circuit has not yet addressed *Younger*'s application to subpoena enforcement actions. But at least three other federal courts have, and each found that *Younger* did not apply.

The Third Circuit Court of Appeals addressed this issue in 2022 in *Smith & Wesson Brands, Inc. v. Attorney General of New Jersey*, 27 F.4th 886 (3d Cir. 2022). The New Jersey Attorney General, investigating consumer fraud, subpoenaed documents related to Smith & Wesson's

---

[3] In *First Choice*, the Supreme Court reiterated that abstention doctrines like *Younger* "supply narrow exceptions" to federal jurisdiction but acknowledged that "the lower courts did not find, and [the attorney general did] not argue, that any of this Court's abstention doctrines apply." 146 S. Ct. at 1126–27. Exodus reads *First Choice* as having found that *Younger* abstention did not apply to the facts of that case, while Rokita argues that the Supreme Court had no occasion to consider whether *Younger* applied (Filing No. 59; Filing No. 62). The Court agrees with Rokita, but regardless, abstention is not required here.

advertisements and products. Smith & Wesson filed a federal Section 1983 action, and the attorney general then filed a state court enforcement action. Smith & Wesson raised many of its constitutional arguments before the state court, but Smith & Wesson was ordered to produce the requested documents. The federal district court then dismissed Smith & Wesson's federal complaint under *Younger*. *Id.* at 890–91. The Third Circuit reversed, finding that the state court enforcement action was not either type of civil proceeding to which *Younger* applies.

The Third Circuit first found that the subpoena enforcement action was distinguishable from "civil enforcement proceedings," which "must be quasi-criminal in nature.'" *Id.* at 891 (citation and quotation marks omitted). The court explained that in the subpoena enforcement action, Smith & Wesson was not alleged to have violated any substantive legal duty. The attorney general was merely investigating such violations. *Id.* at 892; *see id.* at 891–92 (distinguishing *Smith & Wesson* from cases "where more robust preliminary investigations led to the filing of administrative complaints.") *Id.* at 891–92. The court also agreed with Smith & Wesson "that the subpoena enforcement action [was] not a suit initiated to punish wrongdoing," further distinguishing it from "quasi-criminal" enforcement proceedings under *Younger*. *Id.* at 892 ("[M]ost importantly, Smith & Wesson did nothing wrong, so the suit cannot be one 'initiated to sanction [it] for some wrongful act.'" (quoting *Sprint*, 571 U.S. at 79)).

The Third Circuit next held that the state court enforcement action did not involve orders "uniquely in furtherance of the state courts' ability to perform their judicial functions." The court explained that "two leading cases . . . involved such orders": *Juidice v. Vail*, 430 U.S. 327 (1977), which involved state court contempt proceedings; and *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987), which involved a state court judgment to transfer property. Both *Juidice* and *Texaco* were distinguishable based on the type of action the state court needed to take:

24

> In *Juidice*, the plaintiffs had already violated court orders, so they faced imminent imprisonment. In *Pennzoil*, the state court merely had to enter judgment on the jury's verdict. In both cases, the substantive outcome had occurred; only enforcement remained, and the Supreme Court refused to impede that enforcement.

> Here . . . . New Jersey courts still had to adjudicate Smith & Wesson's constitutional arguments; and even if those arguments were resolved against Smith & Wesson, the state courts still had to give the company an opportunity to produce the required documents before holding it in contempt. . . . So this appeal differs materially from *Juidice* and *Pennzoil*, where the state courts merely had to enforce orders.

*Smith & Wesson*, 27 F.4th at 894 (internal citations omitted). The court added, "[i]f a threat of contempt were all that was required to trigger abstention, [federal courts] would have to abstain whenever there was a pending civil proceeding since the contempt power is generally available to enforce court orders. But that approach would run afoul of the Supreme Court's insistence that 'even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the "exception, not the rule."'" *Id.* at 895 (emphasis in original) (quoting *Sprint*, 571 U.S. at 81–82 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984))).

In *Media Matters for America v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *4–5 (D.D.C. Aug. 23, 2024), the District Court for the District of Columbia similarly held that *Younger* did not apply to a state court action to enforce a CID issued by the Missouri Attorney General. As for distinguishing the enforcement action from "civil enforcement proceedings," the *Media Matters* court explained:

> The Missouri state-court action, although filed by a state actor, involved no preliminary investigation and alleged only a violation of a procedural rule governing the production of records, not a substantive legal duty. Nor did the action seek to punish wrongdoing. . . . The same is true today, even after the deadline for production has passed. . . . .

> And because the [CID] is not "self-executing," . . . the enforcement action does not itself seek to sanction wrongful conduct. . . .

> But even if the civil penalty were available, *Younger* abstention still would not be appropriate. . . . [The] state-court action was not the culmination of an investigation into alleged wrongdoing; Defendant was "just at the investigation stage."

25

*Id.* at \*6 (citations omitted).

In distinguishing the Missouri court enforcement action from "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," the *Media Matters* court explained that the types of orders in *Juidice* and *Pennzoil* were "not at issue." *Id.* at \*6–7. The court also noted that the Missouri court action had "barely gotten off the ground," and if the near-complete state court action in *Smith & Wesson* did not trigger *Younger*, then neither did the Missouri court action. *Id.* at \*7. The court rejected the attorney general's assertion that "anytime a state attorney general seeks to enforce a demand for records in state court, the third category is implicated," reminding that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* (citation modified).

Most recently, the Eastern District of Virginia reached the same conclusion in *AJP Educational Foundation, Inc. v. Miyares*, 806 F. Supp. 3d 603 (E.D. Va. 2025). In that case, the Virginia Attorney General issued a CID to plaintiff AJP, an educational nonprofit organization that advocates for justice in Palestine. AJP filed a state court petition to have the CID set aside. The lower state court denied the petition to set aside, and AJP appealed the denial to the state court of appeals. Meanwhile, the attorney general filed a separate state court action to enforce the CID. The lower court granted the petition to enforce and ordered AJP to respond. AJP refused, so the lower court issued an order directing AJP to appear and show cause why it should not be sanctioned. Shortly before the show cause hearing, AJP filed a federal lawsuit and moved for preliminary injunctive relief. The attorney general, among other arguments, asked the district court to abstain under *Younger*. But even though the state court enforcement actions had progressed to contempt proceedings, the district court concluded that *Younger* did not apply:

> The AG's Petition to Enforce is not akin to a criminal prosecution because it does not attempt to punish wrongdoing; rather, it seeks to enforce a procedural rule

> requiring the disclosure of documents upon receiving a CID. Moreover, the [state court's] imposition of a monetary sanction is of no consequence because the AG was just at the initial stages of his investigation and had not yet conducted a robust inquiry into [AJP's] alleged wrongdoing.
>
> Finally, the state proceedings . . . do not fall within the third category of exceptional circumstances in which *Younger* applies. Two cases traditionally define this category, and *Juidice v. Vail*, which involves a state civil contempt order, is most relevant in this civil action. . . . [U]nlike the plaintiffs in *Juidice*, [AJP] has not been accorded an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings. Instead, AMP has been held in contempt for violating a state court order directing it to respond to a CID while there is an appeal pending in the state system as to the constitutionality of that same CID. As the Court's reasoning in *Juidice* reflects, where there is apparently no other forum in which to obtain temporary relief from a potentially unconstitutional state demand, *Younger* abstention is inappropriate.

*Id.* at 621–22 (citation modified) (footnote omitted).

The undersigned is persuaded by the thorough and consistent reasoning of these courts. As Rokita has admitted, the CID does not accuse Exodus of wrongdoing and is merely the start of an investigation into offenses that Exodus may have committed or may have knowledge of. And unlike the state court actions in *Juidice* and *Pennzoil*, the State Court Action here remains in its early stages. No substantive decisions have been made; much more is left for the Indiana court to do than merely enforce orders.

Rokita, however, argues that this case is more like *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982), in which the Supreme Court held that *Younger* barred a lawyer's federal suit challenging a pending state ethics investigation. There, the Court found that the ethics proceedings were "plainly 'akin to a criminal proceeding'" because "[a]n investigation and formal complaint preceded the hearing, an agency of the State's Supreme Court initiated the hearing, and the hearing's purpose was to determine whether the lawyer should be disciplined for failing to meet the State's professional conduct standards." *Sprint*, 571 U.S. at 71

(summarizing *Middlesex*); *see Middlesex*, 457 at 434 n.13 ("The essentially judicial nature of disciplinary actions in New Jersey has been recognized previously by the federal courts.").

The distinctions between this case and *Middlesex* are apparent. Here, the State Court Action represents an initial step in Rokita's investigation. There has been no investigation or allegations of wrongdoing, like there were in *Middlesex*. Indeed, the Office of the Attorney General's press release about the CID quotes Rokita as "emphasiz[ing]" that "'[a]n investigative demand is not an accusation of wrongdoing.'" (Filing No. 1-3 at 2). The State Court Action here is not "akin to a criminal proceeding," so it does not "fall within the *Younger* taxonomy." *AJP*, 806 F. Supp. 3d at 622; *see Smith & Wesson*, 27 F.4th at 891–92 (distinguishing subpoena enforcement action from cases like *Middlesex*, where there were "more robust preliminary investigations" and charges concerned same conduct being investigated); *Media Matters*, 2024 WL 3924573, at *6 (citing *Middlesex* but not finding *Younger* inapplicable because that the state court action at issue "was not the culmination of an investigation into alleged wrongdoing"); *see also Google*, 822 F.3d at 222 n.5 (citing *Middlesex* as an example of civil enforcement proceedings akin to criminal prosecutions, but holding that the state attorney general's non-self-executing subpoena did not mandate *Younger* abstention). For the reasons explained above, consistent with the reasoning in *Smith & Wesson*, *Media Matters*, and *ALJ*, the Court finds that none of the circumstances in *Younger* applies to the State Court Action, and *Younger* does not compel abstention under the facts of this case.

Rokita also argues that the factors announced in *Middlesex*—ongoing state judicial proceedings, important state interests, and opportunities to raise federal challenges in state court— favor abstention. 457 U.S. at 432; (Filing No. 31 at 23–24). However, the Supreme Court has since clarified that these factors are "not dispositive" and are "instead, *additional* factors appropriately

considered by the federal court before invoking *Younger*." *Sprint*, 571 U.S. at 81 (emphasis in original). The Supreme Court continued that if these factors were "divorced from their quasi-criminal context," they "would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest. That result is irreconcilable with our dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.* at 81–82 (rejecting the "extraordinary breath" attributed to *Middlesex* by the circuit court, and reversing conclusion that *Younger* abstention is warranted whenever *Middlesex* factors are met). Because the State Court Action does not fall within any of the three "exceptional" *Younger* categories, the Court need not reach the *Middlesex* factors.

## 2.  <u>Abstention under Principles of Federalism and Comity</u>

The Supreme Court has held that when a case "presents none of the circumstances the [Supreme] Court has ranked as 'exceptional,' the general rule governs: 'the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Sprint*, 571 U.S. at 73 (quoting *Colorado River*, 424 U.S. at 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910))). Nevertheless, Rokita argues that general principles of federalism, comity, and equity require abstention.

Rokita relies on *J.B. v. Woodard*, 997 F.3d 714, 723 (7th Cir. 2021). In *J.B.*, the father/husband in ongoing state court divorce and child custody proceedings filed a federal action against child-welfare employees after an investigator accused the father of choking his son and emailed the mother's divorce attorney about visitation. The defendants asked the federal court to abstain. However, none of the discrete abstention doctrines, when viewed "in isolated fashion," applied to the father's claims; *Younger* did not "fit[] exactly," *Rooker-Feldman* was not "spot on," and the father's claims did not "fit the narrow and precise parameters" of the domestic-relations

29

exception to federal jurisdiction. *Id.* at 722–24. Yet the Seventh Circuit held that even if "none of the abstention doctrines is a literal or perfect fit," general principles of comity, equity, and federalism may counsel abstention. *Id.* "To insist on literal perfection—based on the allegations in [the father's] complaint—risks a serious federalism infringement." *Id.* at 723. The appellate court noted that "the entire design" of the father's federal action was to a obtain a ruling that he could use to disrupt "local family law proceedings—a robust area of law traditionally reserved for state and local government." *Id.* at 723 (citing *DuBroff v. DuBroff*, 833 F.2d 557, 561 (5th Cir. 1987) ("[T]here is perhaps no state administrative scheme in which federal court intrusions are less appropriate than domestic relations law.")).

Unlike *J.B.*, this case does not present a near-perfect fit for several abstention doctrines, nor does it address a robust area of law traditionally reserved for state courts, like family law. Further, there is no evidence that Exodus is pursuing this action to shape or disrupt the later-filed State Court Action. This is simply not a case in which application of the "general rule" on parallel proceedings would risk a serious federalism infringement. *Colorado River*, 424 U.S. at 817.

Rokita offers no persuasive reason why the Court should breach its "virtually unflagging" obligation to hear and decide this case. *Colorado River*, 424 U.S. at 817; *Sprint*, 571 U.S. at 77. The mere fact that this action and the State Court Action involve the same CID, or that either court could hear the same constitutional arguments, is not enough. *Colorado River*, 424 U.S. at 817; *Sprint*, 571 U.S. at 77 ("Parallel state-court proceedings do not detract from that obligation.").

The Court **denies** Rokita's Motion to Dismiss on the basis of abstention.

C.    **Preliminary Injunction Factors**

The Court now turns to whether Exodus is entitled to a preliminary injunction enjoining enforcement of the CID. As previously stated, to obtain a preliminary injunction, Exodus must establish: (1) that it is likely to succeed on the merits of its claims; (2) that it has no adequate

30

remedy at law; (3) that it is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in its favor; and (5) issuing the injunction is in the public interest. *GEFT,* 922 F.3d at 364. The first two factors are threshold determinations. "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Gr,. Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The Court will address each of these factors (including Rokita's 12(b)(6) arguments), in turn.

### 1.  Likelihood of Success on the Merits

A party moving for preliminary injunctive relief need not demonstrate a likelihood of "absolute success on the merits." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). However, the plaintiff "must demonstrate that 'its claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Ty, Inc.*, 237 F.3d at 895). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Id.* (citing *Ty, Inc.*, 237 F.3d at 895).

Exodus argues that it is likely to succeed on the merits of two of its claims: that the initiation of Rokita's investigation constitutes First Amendment retaliation; and that the disclosure of information compelled by the CID impinges on Exodus's associational and expressive rights without adequate justification (Filing No. 36 at 17). To obtain a preliminary injunction, a plaintiff need only show it is likely to succeed on at least one if its claims, not all of them. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (citing *Ty, Inc.*, 237 F.3d at 897), *abrogated on other grounds by Nyken v. Holder*, 556 U.S. 418, 434 (2009). The Court therefore focuses on Exodus's strongest claim —retaliation.

31

To establish a likelihood of success on the merits of its First Amendment retaliation claim, Exodus must demonstrate: "(1) that [it] engaged in protected First Amendment activity, (2) that [it] suffered a deprivation because of that activity, and (3) causation—that is, that the First Amendment activity was at least a motivating factor in [Rokita's] decision to take the retaliatory action." *Minocqua Brewing Co. v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). Rokita raises several arguments in opposition to Exodus's request for a preliminary injunction and in support of his request for dismissal for failure to state a claim. The Court will first address Rokita's arguments about the applicable pleading standard for the retaliation claim and then address his challenges to each element.

### a. Pleading Standard

Rokita argues that cases of retaliatory investigations, including this one, must adhere to "the same pleading standard that applies to retaliatory arrest and retaliatory prosecution claims" (Filing No. 31 at 26; *see* Filing No. 52 at 25–27). For claims of retaliatory arrests and prosecutions, plaintiffs must plead a lack of probable cause for the underlying criminal charges. *Hartman v. Moore*, 547 U.S. 250, 252 (2006) (retaliatory prosecutions); *Nieves v. Bartlett*, 587 U.S. 391, 404, 407 (2019) (certain retaliatory arrests). However, there is no precedent holding that this "no-probable-cause requirement" applies to retaliatory investigations, much less civil investigations.

While this question appears to be a matter of first impression for the Seventh Circuit,[4] another federal court has explained why the no-probable-cause requirement is a poor fit for retaliatory-CID claims. *Media Matters*, 2024 WL 3924573, a *12 (explaining that CIDs, unlike

---

[4] Rokita asserts that "[t]he Seventh Circuit has already chosen to expand the *Nieves* standard beyond cases involving prosecutions and arrests," citing *Kitterman v. Belleville*, 66 F4th 1084 (7th Cir. 2023) (Filing No. 31 at 33). Rokita is incorrect. In *Kitterman*, the Seventh Circuit merely assumed (absent dispute by the parties) that *Nieves* applied to both "actual and attempted" arrests for purposes of the pending motion. The court expressly declined to "test the outer limits of *Nieves*" or decide whether it applies to attempted arrests, much less other non-arrest civil claims. *Id.* at 1091.

arrests or prosecutions, "cannot be measured against a recognized evidentiary standard like probable cause," are issued by the same person with the retaliatory motive, and do not usually involve "multiple government actors"; that protected speech is less often a "wholly legitimate consideration" for making civil enforcement decisions because no "split-second" decisions are involved; and in any event, a CID would likely fall within *Nieves* exception for circumstances in which officers have probable cause but typically exercise discretion not to make an arrest)).

The few courts that have been asked to extend *Hartman* and *Nieves* to retaliatory investigation claims, or to other non-prosecution/non-arrest civil claims, have declined to do so. *Id.* at \*13; *Bello-Reyes v. Gaynor*, 985 F.3d 696, 698, 700–01 (9th Cir. 2021) (declining to apply *Nieves* to case of retaliatory bond revocation and re-arrest by ICE); *Welch v. Dempsey*, 51 F.4th 809, 812–13 (8th Cir. 2022) (declining to extend *Nieves* beyond claims of retaliatory Fourth Amendment seizures); *Colonies Partners LP v. County of San Bernadino*, No. 18-240, 2020 WL 5102160, at \*22 (C.D. Cal. July 28, 2020) (citing cases not applying *Nieves* to retaliatory investigation cases); *see also Gonzalez v. Trevino*, 602 U.S. 653, 664 (2024) (Alito, J., concurring) ("[W]e have required plaintiffs pressing [retaliatory-arrest and retaliatory-prosecution] claims to prove the absence of probable cause as a threshold requirement before they can advance their claims under the *Mt. Healthy* framework.").

However, this Court need not, and therefore does not, decide whether the no-probable-cause requirement applies to retaliatory investigation claims for two reasons. First, even if it did apply, the information on which Rokita relied in issuing the CID—one ICE agent's speculation about Exodus's speech and what that suspected speech might imply, and Exodus's mere provision of services to trafficking victims—does not satisfy the probable cause standard. Rokita does not contend otherwise. *See United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011) ("Probable cause

33

means that there are 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979))).

Second, Rokita does not argue that Exodus must plead the absence of probable cause; instead, he argues that Exodus must plead and prove the absence of "reasonable cause," which is the low standard applicable to CIDs under Indiana Code § 4-6-3-3. This is not the standard announced in *Hartman* or *Nieves*, and there is no authority whatsoever applying any heightened pleading standard to First Amendment retaliation claims other than the no-*probable*-cause requirement for retaliatory-prosecution and (certain) retaliatory-arrest claims. Importantly, the proposed "no-reasonable-cause" requirement would subject plaintiffs to an even *higher* pleading standard than the no-probable-cause requirement announced in *Hartman* and *Nieves*. This is because "reasonable cause" is a much lower standard than "probable cause," meaning it is much easier for the government to show and, conversely, much more difficult for plaintiffs to show its absence. Additionally, the use of a "no-reasonable-cause" standard in cases alleging retaliatory CIDs risks intruding upon state courts' statutory authority to determine whether a CID is enforceable under Indiana Code § 4-6-3-5(a). Rokita argues that government investigations share some similarities with prosecutions and arrests, but this is not enough to convince the Court to adopt his novel pleading standard. Exodus is not required to plead a lack of "reasonable cause," Ind. Code § 4-6-3-3, to adequately plead its First Amendment retaliation claim.

The Court now turns to each of the three substantive elements of Exodus's retaliation claim: protected speech, a deprivation of rights, and causation. *Minocqua Brewing*, 160 F.4th at 855.

### b. **Protected Speech**

Whether speech is constitutionally protected is a question of law, "even though it may . . . require[] predicate factual determinations." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). Exodus identifies several types of expressive speech and speech activities in which it engages, all of which it contends are protected (Filing No. 36 at 19–20). Exodus asks the Court "to focus on the sum total of Exodus's expressive and associational activities." *Id.* at 20. But for purposes of the instant motions, the Court chooses to focus on Exodus's speech regarding the ICE operation in Bloomington, which Exodus believes would "yield[] the same result" as a broader discussion. *Id.*

Exodus disseminated truthful information about planned ICE activities in or around Bloomington to other local organizations and a few individuals, all of whom have lawful status in the United States. There is no evidence that this speech did, or attempted to, conceal or aid anyone subject to arrest from evading law enforcement. The evidence in the record shows that Exodus spread this information to mitigate panic and avoid unnecessary disruption to its operations.

Rokita does not dispute that this specific speech is protected (Filing No. 52 at 28 (arguing only that the suspected communications "depending on their context, *may* violate federal criminal statutes" and "*[i]f* that's the case, the communications are clearly not protected" (emphases added))). Absent any dispute, at this stage, the Court finds that Exodus is likely to succeed in showing that its truthful notification to other organizations and select clients about the planned ICE operation is protected by the First Amendment. *See* (Filing No. 36 at 21 (citing cases, not including Seventh Circuit, holding that even warnings about law enforcement presence is protected, so long as speaker does not coordinate with lawbreakers); *Obreicht v. Splinter*, No. 18-cv-877, 2019 WL 1779226, *5 (W.D. Wis. Apr. 23, 2019) (denying motion to dismiss first amendment retaliation claim arising from plaintiff's detention and arrest for flashing headlights to oncoming drivers to warn of speed trap; "although the law is far from clear on this issue, defendants

have failed to meet their burden of showing that [plaintiff] has no plausible claim for relief under the First Amendment"); *cf. Bartnicki v. Vopper*, 532 U.S. 514, 527–28 (2001) ("As a general matter, state action to punish the publication of truthful information seldom can satisfy constitutional standards." (citation modified)); *cf. Reporters Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 938 (S.D. Ind. 2024) (describing officer's order to "move back simply because the officer does not want to be recorded" as an "unacceptable curtailment of First Amendment rights" (citing *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012))).

In his briefing, rather than challenging the constitutionality of the above speech, Rokita focuses on Exodus's *suspected* unprotected speech. He argues that because he issued the CID based on ICE's suspicion that Exodus engaged in unprotected speech, Exodus cannot satisfy the first element of its claim (Filing No. 31 at 34–36 ("Expressive activity in which Plaintiff *may have* engaged . . . connected with *possible* violations of federal and state law is not protected activity." (emphases added))). However, there is no evidence that Exodus engaged in any such unprotected speech, and Rokita's suspicions have no bearing on whether Exodus engaged in protected speech. Rokita's suspicions, at most, relate to causation, which is discussed below.

Exodus has established a reasonable likelihood of showing that it engaged in protected speech when it shared information about the planned ICE operation in Bloomington. Exodus has therefore satisfied the first element of its retaliation claim.

### c. **Deprivation**

Whether retaliatory conduct would "deter a person of ordinary firmness" from exercising his First Amendment rights is an objective test. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) ("This is an objective standard; it does not hinge on the personal experience of the plaintiff."). Exodus argues that the issuance of an intrusive CID by Rokita, who "frequently espouses policies at odds with Exodus's mission and

employs rhetoric critical of the persons it serves," during a time when immigrants are being increasingly detained, would undoubtedly deter a person of ordinary firmness from associating with Exodus and reasonably deter Exodus from fully exercising its First Amendment rights (Filing No. 36 at 21–22; Filing No. 38 at 24–26). Rokita argues that Exodus cannot satisfy the second element of its claim for two reasons: law enforcement investigations are never sufficiently adverse to sustain a First Amendment claim; and the issuance of the CID here is not sufficiently adverse. The Court addresses each argument in turn.

### i.  Whether Retaliatory Investigations Can Be Sufficiently Adverse

Momentarily setting aside the fact that Rokita has not merely opened an investigation into Exodus, but has also published inflammatory statements about Exodus and its clients, the Court considers Rokita's argument that no retaliatory law enforcement investigation of any kind, by itself, is ever sufficiently adverse to form a First Amendment claim. The Supreme Court has reserved the issue of "[w]hether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 261 n.9, and the Seventh Circuit has not yet directly addressed the issue. *See Swetlik v. Crawford*, 738 F.3d 818, 825 n.2 (7th Cir. 2013) (assuming, without deciding, whether bringing formal, public charges that caused plaintiff's suspension and could have led to termination "were sufficient to deter protected speech"). Rokita asks this Court to decide that a law enforcement investigation can never form a First Amendment retaliation claim. Rokita relies on a variety of cases, mostly outside of the Seventh Circuit, none of which is persuasive here.

To start, Rokita cites several cases holding that retaliatory investigations do not always violate the First Amendment. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was *always* actionable *no matter how unlikely* to deter a person of ordinary firmness from that

37

exercise." (emphases added)); *see also Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) ("Plaintiffs identify no caselaw that clearly established that a retaliatory investigation *per se* violates the First Amendment." (emphasis added)). However, none of these cases support the inverse proposition—that a retaliatory investigation can *never* violate the First Amendment.

Other cases cited by Rokita hold that no "clearly established" law provides that retaliatory investigations violate the First Amendment. These cases are inapposite for many reasons. Most obviously, they all address qualified immunity, which is not an issue here. To defeat a qualified immunity defense, a plaintiff must show (1) that the retaliation violated the plaintiff's rights; and (2) that the defendant's conduct violated clearly established law. *E.g.*, *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). These are separate inquiries, so a defendant's conduct may violate a plaintiff's rights without violating clearly established law, and vice versa. Indeed, many of the cases cited by Rokita did not even address whether the retaliatory investigations at issue violated the plaintiffs' First Amendment rights. *Moore*, 83 F.4th at 750; *J.T.H. v. Mo. Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489, 492–93 (8th Cir. 2022); *Lincoln v. Maketa*, 880 F.3d 533, 537–38 (10th Cir. 2018); *Rehberg v. Paulk*, 611 F.3d 828, 850–51 (11th Cir. 2010). The absence of "clearly established law" thus does not preclude First Amendment retaliatory investigation claims.

Moreover, the cited courts' discussions about "clearly established law" do not apply to any and all law enforcement investigations. They apply only to the types of investigations at issue in those cases. "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *cf. Colson v. Grohman*, 174 F.3d 498, 500 (5th Cir. 1999) (stating, outside qualified immunity context, that "the precise nature of the harms suffered by a plaintiff claiming First Amendment retaliation is crucial to our determination of whether she

has alleged a constitutional deprivation"). Most of the cited decisions involved investigations that are readily distinguishable from the CID in this case. *J.T.H. v. Missouri Department of Social Services Children's Division*, 39 F.4th 489 (8th Cir. 2022) (stating Eighth Circuit has "never recognized a retaliatory-investigation claim *of this kind*," referring to plaintiffs' claim that the defendant instituted a child-abuse investigation in retaliation for the plaintiffs' threat to sue a sheriff's deputy for sexually abusing the plaintiffs' child; and noting that the law on retaliatory investigation claims is "still in flux" (emphasis added)); *Colson*, 174 F.3d at 498, 512, 514 (finding no actionable claim where defendants' retaliatory "criticism, an investigation (or an attempt to start one), and false accusations" were "no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure" and "seem[ed] to have had no effect other than to make [the plaintiff] become more careful on which items [she] would vote on"); *Rehberg*, 611 F.3d 828 (no clearly established law on retaliatory criminal investigation), *Thompson v. Hall*, 426 F. App'x 855 (11th Cir. 2011) (citing *Rehberg*) (same), *Lincoln*, 880 F.3d at 540 (same).

Rokita does cite one Seventh Circuit decision, *Archer v. Chisholm*, 870 F.3d 603 (7th Cir. 2017), but it does not carry the day. In *Archer*, the plaintiff alleged, among other claims, that the county district attorney instituted a secret criminal investigation against her in retaliation for her work on a legislative campaign. The defendant raised a qualified immunity defense. In addressing the first prong—whether the investigation violated the plaintiff's First Amendment rights—the Seventh Circuit held that the plaintiff was speaking as a public employee, not a private citizen, so the First Amendment did not protect her speech. *Id.* As to the second prong, the court found that "clearly established law" did not prohibit a retaliatory criminal investigation against a public employee. *Id.* at 620. The *Archer* court then added that if the foregoing reasons were "all not enough," dismissal would be further warranted by "the existence of probable cause and the judicial

39

supervision of the investigation [counseling] in favor of . . . qualified immunity," and by the lack of "clearly established rule of law under which an official pursuing a lawful investigation, based on probable cause, has been found liable under the First Amendment to a target." *Id.*

With that background in mind, *Archer* clearly does not support Rokita's broad proposition that retaliatory law enforcement investigations can never violate the First Amendment. *Archer* arose from distinguishable facts; it involved unprotected speech by a public employee, and a court-authorized criminal investigation. The Seventh Circuit's more generalized statement about the "clearly established rule of law" is also not dispositive here for two reasons. First, as discussed above, it speaks only to the existence of clearly established law on retaliatory investigations at the time of that investigation. Second, it applies to "lawful investigation[s], based on probable cause," and the CID here is not supported by probable cause. *Id.* In sum, Rokita's cases discussing "clearly established law," which involve qualified immunity defenses to claims arising out of distinguishable investigations, mostly in other circuits, do not defeat Exodus's claim.

Rokita lastly argues, "'no adverse result occur[s]' simply because an investigation is initiated," particularly where the investigative demand "is not self-executing." (Filing No. 31 at 28 (quoting *Pierce v. Tex. Dep't of Crim. Just., Institutional Dev.*, 37 F.3d 1146, 1150 (5th Cir. 1994) (finding that internal employment investigation resulting in no action taken against plaintiff was insufficiently adverse))). For the reasons discussed at length above, this argument carries no weight following the Supreme Court's decision in *First Choice*.

There is no binding precedent or analogous persuasive authority holding that retaliatory investigations are categorically not actionable under the First Amendment. And to the contrary, several courts, including the Seventh Circuit in dicta, have recognized such claims as actionable. *See Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (en banc), *abrogated on other grounds*

*by Spiegla v. Hull*, 371 F.3d 928, 941–42 (7th Cir. 2004)[5]; *Hernandez v. Cook Cnty. Sheriff's Off.*, No. 07 C 855, 2017 WL 4535982, at \*7 (N.D. Ill. Sept. 25, 2017) (citing cases); *Twitter, Inc. v. Paxton*, No. 21-cv-01644, 2021 WL 1893140, at \*3 (N.D. Cal. May 11, 2021) (citing several Ninth Circuit cases finding retaliatory investigation claims to be actionable, but recognizing that no case had held that a retaliatory investigation, by itself, always forms a claim; addressing whether the CID at issue was sufficiently adverse); *see* (Filing No. 31 at 29–30 (acknowledging but distinguishing cases recognizing retaliatory investigation claims)). Exodus's retaliation claim is not subject to dismissal simply because it arises from a law enforcement investigation.

### ii.  Whether Rokita's Conduct Is Sufficiently Adverse

The Court now turns to whether Rokita's conduct is sufficiently adverse to sustain a First Amendment retaliation claim. Rokita contends that no adverse deprivation of rights has occurred, because any harm to Exodus would occur only if it were compelled to respond to the CID (Filing No. 31 at 28–30). The Court disagrees. As discussed above, the issuance of the CID, which seeks private information about a politically maligned group of people and the organizations who advocate for them, combined with Rokita's public and inflammatory press releases, have chilled the activities of Exodus's staff and clients, and it would likely deter a person of ordinary firmness, including Exodus's current and potential clients, donors, and Exodus's community partners, from expressing their First Amendment rights. *See Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) (stating that for chilling claims, the Seventh Circuit "appl[ies] an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity."); *cf. First Choice*, 146 S. Ct. at 1127 (not reaching merits but finding

---

[5] *Rakovich* was also distinguished by *Archer*, 870 F.3d 603, but on other grounds related to the distinction between public speech and private speech, and claims by public employees. *Archer*, 870 F.3d at 619.

that similar conduct would cause reasonably objective chill). Exodus is likely to show that Rokita's conduct is sufficiently adverse to sustain a First Amendment retaliation claim.

### d. **Causation**

The final merits question is causation. Exodus "can establish causation in this context in the same manner [it] might in other contexts—through direct or circumstantial evidence, the latter of which might involve suspicious timing, disparate treatment of similarly situated entities, ambiguous statements and the like." *Minocqua Brewing*, 160 F.4th at 855. If Exodus makes this showing, then the burden shifts to Rokita to produce evidence that he would have issued the CID even in the absence of Exodus's speech. If Rokita carries that burden, then Exodus must show that Rokita's proffered reasons for issuing the CID are pretextual or that retaliatory animus is the actual motivation behind the CID. *Id.*

Exodus asserts that the CID was motivated entirely by Exodus's expressive activities, as shown by Rokita's admission that the "tip" from ICE about those activities is what prompted Rokita to issue the CID. Exodus further argues that the "exceedingly thin justification" for issuing the CID and exceptionally broad scope of the CID suggest that the proffered reasons for the CID are pretextual, and the real motive is retaliatory (Filing No. 38 at 22–24).

Rokita responds that Exodus cannot show a causal connection between its protected speech and the CID because, as he has publicly reiterated, he issued the CID because he believes that Exodus engaged in *unprotected* activity (Filing No. 31 at 34–36; Filing No. 52 at 28–29). Yet Exodus's protected speech about the ICE operation was the basis for the ICE agent's suspicion about potential unlawful activities, which in turn is the sole reason Rokita suspected that Exodus may have violated Indiana law. (Filing No. 35-2 at 16:25–17:4, 26:20–27:8, 38:19–41:1). Indeed, the CID specifically seeks information about Exodus's speech and activities related to the spring 2025 ICE operation (Filing No. 1-3 at 10–12, 16). Because Exodus's protected speech was the sole

42

basis for the ICE agent's (and thus Rokita's) suspicions of unlawful speech activities, it follows that Rokita would have had no reason to issue the CID absent Exodus's protected speech. Accordingly, Exodus has shown that its protected speech was at least a motivating factor in Rokita's decision to issue the CID, and Rokita has failed to show that but for the protected speech, he still would have issued the CID.

Rokita argues that even if Exodus's protected speech was a motivating factor, Exodus cannot show that the CID was motivated by "retaliatory animus." (Filing No. 31 at 36; Filing No. 52 at 27–28). Rokita contends that to establish a causal connection, Exodus must show that the alleged retaliatory action "'was motivated by the *fact* that [it] engaged in protected activity rather than the *substance* of' the activity," relying on *Holleman v. Zatecky*, 951 F.3d at 880. (Filing No. 31 at 36 (alteration and emphases in original)). *Holleman* does not support Rokita's position. In that case, the plaintiff-prisoner complained about the conditions at his correctional facility, so the department of corrections transferred him to a different facility. The Seventh Circuit, following the standard burden-shifting framework for causation, stated that although "it can be said that the transfer was *caused* by Holleman's protected activity," there was a non-retaliatory reason for transferring the plaintiff—that "a change of scenery and newer facility would benefit [him]"—that the plaintiff could not show was pretextual. *Id.* at 878 (emphasis in original). The Seventh Circuit distinguished between conduct motivated by the fact that a prisoner complains and conduct motivated by the substance of, and an intent to remedy, his complaints. *Id.* at 878–79 ("It was not the prisoner's engagement in protected activity that motivated his transfer; rather, the transfer was in response to the substance of his complaints and motivated by the possibility of remedying those complaints by [transferring] him.").

No Seventh Circuit court has applied the above distinction outside of prisoner litigation, but in any event, it does not warrant dismissal of Exodus's claim. The CID was not issued as a "justifiable response" to the substance of Exodus's speech, which was merely the time and location of the ICE operation. Rokita allegedly issued the CID to punish Exodus for its act of notifying others about the ICE operation, which relates to both the fact and substance of Exodus's speech.[6]

Although Rokita proffers a second non-retaliatory reason for issuing the CID—investigating labor trafficking—several factors show this reason is pretextual, including: the timing of the CID's issuance to Exodus (just a few weeks after the call between the ICE agent and Lanning about Exodus's protected speech); the tenuous rationale connecting Exodus to labor trafficking offenses (because "Exodus works with an immigrant population and works with employers of that population" (Filing No. 35-2 at 44:22–23, 52:6–12)); and the disproportionately broad scope of the CID, which essentially seeks all information about Exodus's operations, clients, partners, and donors for the past three years (Filing No. 36 at 24; Filing No. 57 at 11–13).

For the above reasons, Exodus has adequately alleged a First Amendment retaliation claim and shown a reasonable likelihood of success on the merits of that claim, and Rokita's Motion to Dismiss for failure to state a claim is **denied**.

Having found that Exodus is likely to succeed on the merits of its retaliation claim, the Court considers whether Exodus has an adequate remedy at law, what irreparable harm will occur if injunctive relief is denied, and the balance of harms. *See Reporters Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729–30 (7th Cir. 2025) ("[W]hen a plaintiff establishes a likelihood

---

[6] As a more general matter, the Court agrees with Exodus that Rokita's apparent takeaway from *Holleman*—*i.e.*, that the government may lawfully retaliate against individuals based on the content of their speech, and must only refrain from retaliating against individuals for simply speaking, regardless of the content (Filing No. 31 at 36–37)—cannot be squared with First Amendment jurisprudence, "for it is almost always the 'substance' of an individual's constitutionally protected activity that leads to the challenged retaliation." (Filing No. 57 at 12–13).

44

of success on the merits of a constitutional challenge to a statute implicating First Amendment freedoms, the other preliminary injunction factors are easily met." (citing *Alvarez*, 679 F.3d at 589–90 (7th Cir. 2012); *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

## 2. <u>Irreparable Harm With No Adequate Remedy at Law</u>

Irreparable harm exists where "legal remedies such as monetary damages are inadequate" to address the harm. *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005). It is well established that "even short deprivations of First Amendment rights constitute irreparable harm." *Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Exodus has established that its staff and clients have changed their behavior as a result of the CID in ways that impede Exodus's exercise of its right to associate. Specifically, Exodus's staff have become cautious about seeking or collecting information from clients, since they do not want to obtain information that might later be turned over to a third party, which hinders the staff's ability to have free and candid discussions among themselves, partners, and clients, and to fully provide services to their clients (Filing No. 1 ¶¶ 69–70). Exodus also offers evidence that the CID threatens to deter or discourage clients, community partners, and donors from associating with Exodus. *Id.* ¶ 69; *First Choice*, 146 S. Ct. at 1125 (explaining that demands for private information can harm First Amendment rights by discouraging people from associating with the plaintiff).[7]

In response, Rokita contends that the mere issuance of a non-self-executing subpoena causes no irreparable injury, and that Exodus has an adequate remedy at law because it will have

---

[7] Rokita briefly argues that Exodus cannot establish a First Amendment injury because it "only asserts that the CID might have chilled the speech of *other* persons or entities." (Filing No. 31 at 21 (emphasis in original)). This argument finds no footing in caselaw on associational rights and ignores well established precedent, summarized in *First Choice*, holding that discouraging others from associating with an individual can harm that individual's associational rights.

an opportunity to raise its constitutional arguments in the State Court Action (Filing No. 52 at 31; Filing No. 31 at 18–19 (citing *Reisman*)). For the reasons explained above, Exodus has shown that it has been and still is suffering irreparable harm to its First Amendment rights. *Joelner*, 378 F.3d at 620 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury, and money damages are therefore inadequate." (citation modified)). Exodus has established irreparable harm with no adequate remedy at law.

### 3.  <u>Balance of Harms and Public Interest</u>

The final two questions are whether the balance of harms and public interest weigh in favor of preliminary relief. These factors may be viewed together. The Court "weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell*, 796 F.3d at 662. And where a state action results in loss of First Amendment freedoms, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of [an action] that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90.

Rokita argues that Exodus will suffer no "immediate consequence" absent an injunction because the CID is not self-executing (Filing No. 52 at 32). The Court has already explained why this argument fails. Rokita also argues that any delay in his investigation into labor trafficking harms the public's and Indiana's interest in enforcing state laws, particularly because "the conduct being investigated poses serious public safety risks." (Filing No. 52 at 32). The risks of a delayed investigation are not nearly enough to tilt the scales in Rokita's favor for several reasons. To start, even if a preliminary injunction were denied, his investigation would not necessarily proceed. A state court would still need to find that the CID is enforceable, which is not certain to happen. *See* Order, *Berry Global*, No. 82D03-2504-MI-002439 (Vanderburgh Super. Ct.) (Oct. 8, 2025)

(denying petition to enforce similar CID). Further, Rokita's concern about "public safety risks" is mitigated by the fact that this Court's preliminary injunction will be limited to the instant CID. It does not prohibit Rokita from pursuing other lawful avenues of investigation, nor does it prevent law enforcement from investigating or prosecuting instances of labor trafficking or other crimes.

Most importantly, there can be no irreparable harm to the public when the State is prevented from enforcing an unconstitutional subpoena because "it is always in the public interest to protect first amendment liberties." *Joelner*, 378 F.3d at 620 (citation modified); *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[W]e believe that the public interest is better served by . . . protecting . . . core First Amendment right[s]"); *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.").

Without an injunction, Exodus would continue to be harmed by the threat of enforcement of the CID and the resulting curtailment of Exodus's First Amendment rights. The balance of harms weighs greatly in Exodus's favor, and the public interest will not be harmed by an injunction temporarily enjoining enforcement of the likely unconstitutional CID.

Because each of the factors for issuance of a preliminary injunction weighs in favor of Exodus, the Court **grants** Exodus's Motion for Preliminary Injunction. Rokita does not request a bond or contend he will incur monetary damages from this injunction. The Court therefore waives the security requirement of Federal Rule of Civil Procedure 65(c). *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (stating district court can waive bond requirement when there is no danger the opposing party will incur any damages from the injunction).

## IV.    CONCLUSION

For the foregoing reasons, Todd Rokita's Motion to Dismiss (Filing No. 30) is **DENIED**, and Exodus Refugee Immigration, Inc's. Motion for Preliminary Injunction (Filing No. 10) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 65(d), Todd Rokita, in his official

capacity as the Attorney General of the State of Indiana, is **PRELIMINARILY ENJOINED** from enforcing the Civil Investigative Demand served in September 2025 or taking any adverse action against Exodus because of its failure to respond to the Civil Investigative Demand. Exodus need not post a bond. As required, the Preliminary Injunction will issue in a separate Order.

      **SO ORDERED**.

Date: 8/5/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Joshua Bleisch
American Civil Liberties Union of Indiana
jbleisch@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Olivia Key
Office of the Indiana Attorney General
olivia.key@atg.in.gov
Blake Lanning
Office of IN Attorney General
blake.lanning@atg.in.gov
Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Aaron M. Ridlen
INDIANA ATTORNEY GENERAL
aaron.ridlen@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com